Case No. 24-6148

United States Court of Appeals
for the Sixth Circuit

United States of America                                    Plaintiff-Appellee

V.

Jeremy Wayne Harrell                                 Defendant-Appellant

---

Appeal from the United States District Court
for the Eastern District of Kentucky

---

Brief of the Plaintiff-Appellee
United States of America

---

Paul C. McCaffrey
Acting United States Attorney

Charles P. Wisdom Jr.
Chief, Appellate Division

By:   James T. Chapman
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4804
James.Chapman2@usdoj.gov

Counsel for Plaintiff-Appellee

# TABLE OF CONTENTS

Table of Authorities ..................................................................................... ii

Statement Regarding Oral Argument ...................................................... vii

Statement of the Issues ................................................................................1

Statement of the Case ..................................................................................1

Summary of the Argument ...........................................................................5

Argument

    I.      The evidence sufficiently supported Harrell's conviction ...................7

    II.     The loss amount was properly calculated.  Alternatively, any error in including the IU benefits paid to Harrell after the date of the Indictment as loss was harmless ...........................................................25

    III.    Harrell was required, and failed, to file a separate notice of appeal from the district court's amended judgment and subsequent forfeiture order, precluding this Court's review of Harrell's challenges to the district court's amended judgment and forfeiture order ......................36

Conclusion .................................................................................................52

Certificate of Compliance

Certificate of Service

Designation of District Court Documents

i

# TABLE OF AUTHORITIES

## I.  Cases

*Anderson v. Bessemer City*,
   470 U.S. 564 (1985) ................................................................................39

*Burley v. Gagacki*,
   834 F.3d 606 (6th Cir. 2016) ...........................................................37, 41

*Cochran v. Birkel*,
   651 F.2d 1219 (6th Cir. 1981) ........................................................ 48-49

*Dolan v. United States*,
   560 U.S. 605 (2010) ................................................................................42

*Island Creek Coal Sales Co. v. City of Gainesville*,
   764 F.2d 437 (6th Cir. 1985) .......................................................... 47-48

*Manrique v. United States*,
   581 U.S. 116 (2017) ................................................................................37

*McIntosh v. United States*,
   601 U.S. 330 (2024) .................................................................43, 45, 47

*N.Y. State Nat'l Org. for Women v. Terry*,
   886 F.2d 1339 (2d Cir. 1989) ........................................................59, 51

*Tillman Transportation, LLC v. MI Bus. Inc.*,
   95 F.4th 1057 (6th Cir. 2024) ...............................................................42

*United States v. Agrawal*,
   97 F.4th 421 (6th Cir. 2024) .......................................................... 40-41

*United States v. Aparco-Centeno*,
   280 F.3d 1084 (6th Cir. 2002) ...............................................................44

*United States v. Battles*,
  745 F.3d 436 (10th Cir. 2014) ...............................................................49

*United States v. Bogart*,
  576 F.3d 565 (6th Cir. 2009) ................................................................38

*United States v. Carman*,
  933 F.3d 614 (6th Cir. 2019) ..........................................................43, 49

*United States v. Carter*,
  89 F.4th 565 (6th Cir. 2023) ........................................................... 44-45

*United States v. Castro*,
  960 F.3d 857 (6th Cir. 2020) ................................................................34

*United States v. Daniel*,
  329 F.3d 480 (6th Cir. 2003) .................................................................9

*United States v. Fecondo*,
  No. 22-00011, 2023 WL 7646494 (E.D. Pa. Nov. 14, 2023) ...............33

*United States v. Ferrario-Pozzi*,
  368 F.3d 5 (1st Cir. 2004) .....................................................................51

*United States v. Fowler*,
  819 F.3d 298 (6th Cir. 2016) ................................................................40

*United States v. Glover*,
  242 F.3d 333 (6th Cir. 2001) .......................................................... 36-37

*United States v. Gonzalez-Rivera*,
  111 F.4th 150 (1st Cir. 2024) ...............................................................38

*United States v. Guerrero*,
  76 F.4th 519 (6th Cir. 2023) ................................................................29

*United States v. Hall*,
  373 F. App'x 588 (6th Cir. 2010) .........................................................44

iii

*United States v. Hall*,
  549 F.3d 1033 (6th Cir. 2008) ................................................................8

*United States v. Harrison*,
  823 F. App'x 430 (7th Cir. 2020) .................................................42, 49

*United States v. Iossifov*,
  45 F.4th 899 (6th Cir. 2022) ............................................................ 26-27

*United States v. Jefferson*,
  149 F.3d 444 (6th Cir. 1998) ..............................................................23

*United States v. Johnson*,
  79 F.4th 684 (6th Cir. 2023) ..............................................................35

*United States v. Johnson*,
  440 F.3d 832 (6th Cir. 2006) .......................................................... 8-9

*United States v. Jones*,
  716 F.3d 851 (4th Cir. 2013) ......................................................... 32-33

*United States v. Louchart*,
  579 F. App'x 492 (6th Cir. 2014) .......................................................39

*United States v. Maddux*,
  37 F.4th 1170 (6th Cir. 2022) ........................................... 43, 47, 49-50

*United States v. Martirossian*,
  917 F.3d 883 (6th Cir. 2019) ..............................................................42

*United States v. Maya*,
  966 F.3d 493 (6th Cir. 2020) ................................................................8

*United States v. McDougal*,
  368 F. App'x 648 (6th Cir. 2010) .................................................42, 49

*United States v. Palacios*,
  No. 22-11676, 2024 WL 4430281 (11th Cir. Oct. 7, 2024) .......................... 41-42

iv

*United States v. Riccardi*,
  989 F.3d 476 (6th Cir. 2021) ....................................................25

*United States v. Rivera-Ortiz*,
  14 F.4th 91 (1st Cir. 2021) ....................................................33

*United States v. Robinson*,
  99 F.4th 344 (6th Cir. 2024) ................................. 10, 13-16

*United States v. Rogers*,
  769 F.3d 372 (6th Cir. 2014) ....................................................9

*United States v. Rosales*,
  990 F.3d 989 (6th Cir. 2021) ....................................................24

*United States v. Snelling*,
  768 F.3d 509 (6th Cir. 2014) ....................................................25

*United States v. Tribble*,
  209 F. App'x 332 (4th Cir. 2006) ....................................................32

*United States v. Tulsiram*,
  815 F.3d 114 (2d Cir. 2016) ....................................................42, 49

*United States v. Vance*,
  Nos. 23-5766/5773, 2024 WL 4867049
  (6th Cir. Nov. 22, 2024) .......................................9-10, 14-16, 29, 41

*United States v. Wallace*,
  51 F.4th 177 (6th Cir. 2022) ....................................................23

*United States v. Washington*,
  715 F.3d 975 (6th Cir. 2013) ....................................................9

*United States v. Wendlandt*,
  714 F.3d 388 (6th Cir. 2013) ....................................................26

v

*United States v. White*,
    492 F.3d 380 (6th Cir. 2007) ...............................................38

*United States v. Young*,
    847 F.3d 328 (6th Cir. 2017) ...............................................47

*Williamson v. Recovery Ltd. P'ship*,
    731 F.3d 608 (6th Cir. 2013) ...............................................47

## II.  Statutes, Rules, Regulations & Guidelines

18 U.S.C. § 641 ..................................................... 5, 7-9, 45

18 U.S.C. § 3663A(a)(1) ...............................................38

18 U.S.C. § 3663A(c)(1)(A)(ii) ........................................38

18 U.S.C. § 3664(e) ...................................................38

18 U.S.C. § 3664(f)(1) ................................................38

28 U.S.C. § 1291 ......................................................42

Fed. R. App. P. 3(c)(1) ...............................................36

Fed. R. App. P. 3(c)(1)(B) ......................................... 36-37

Fed. R. App. P. 4(b) ..............................................41, 48

Fed. R. App. P. 4(b)(5) ............................................7, 48

Fed. R. Crim. P. 32.2 .......................................42-43, 45, 51

Fed. R. Crim. P. 32.2(b) ...........................................7, 43

Fed. R. Crim. P. 32.2(b)(2)(B) .....................................43, 45

Fed. R. Crim. P. 32.2(b)(2)(C)...............................................45-47, 49-50

Fed. R. Crim. P. 32.2(b)(4)(B) .................................................. 43, 46-47

Fed. R. Crim. P. 32.2(b)(4)(C) ..........................................................41

Fed. R. Crim. P. 32.2(e) ...................................................................41

Fed. R. Crim. P. 32.2(e)(1) ...............................................................45

Fed. R. Crim. P. 35(a) ...........................................................7, 48, 50

6 Cir. I.O.P. 10(d) ..........................................................................34

LCrR 47.1(d) ................................................................................43

38 C.F.R. § 3.103(b)(2) ..................................................................30

38 C.F.R. § 3.103(c) .......................................................................30

38 C.F.R. § 3.103(d)(1) ...................................................................30

U.S.S.G. § 1B1.1 cmt. n.1(I) ...........................................................31

U.S.S.G. § 1B1.3(a)(2).....................................................................31

U.S.S.G. § 2B1.1(b)(1) ........................................................ 25-26, 31, 35

U.S.S.G. § 2B1.1(b)(1)(F) ........................................................6, 25, 34

U.S.S.G. § 2B1.1 cmt. n.3(E)(ii)........................................................33

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not request oral argument.

## STATEMENT OF THE ISSUES

I.      Whether the evidence sufficiently supported Harrell's conviction.

II.     Whether the district court properly calculated the loss amount. Alternatively, whether any error in including the benefits paid to Harrell after the date the Indictment was returned as loss was harmless.

III.    Whether Harrell was required, and failed, to file a separate notice of appeal from the district court's amended judgment ordering restitution and subsequent forfeiture order.  Alternatively, whether Harrell's challenges to those orders have any merit.

## STATEMENT OF THE CASE

From approximately February 2019 through October 2023, Jeremy Wayne Harrell, a United States Army veteran and recipient of Individual Unemployability (IU) benefits through the U.S. Department of Veterans Affairs (VA), failed to disclose and affirmatively lied about his ability to work and the specifics of his work as the Founder and Chief Executive Officer (CEO) of Veterans Club, Inc. (VC), in order to fraudulently continue to receive IU benefits.

Specifically, at "all relevant times, the [VA] provided medical benefits and monetary compensation to veterans . . . who incurred an injury while in service with the United States Armed Services."  [R. 76:  Presentence Report at ¶ 7.]  IU

1

benefits "were one part of the VA's disability compensation scheme." [*Id.* at ¶ 8.] "To be eligible for IU benefits, a veteran must, among other things, be unable to maintain substantial gainful employment because of his service-connected disabilities." [*Id.*] "If a veteran voluntarily chose not to work at substantial gainful levels or chose to work at substantial gainful levels but not receive payment for his work, the veteran would not be entitled to IU benefits." [*Id.*]

"Harrell served in the United States Army/United States Army Reserve from October 5, 1999, through February 1, 2008." [*Id.* at ¶ 10.] "On or about April 22, 2011, Harrell was awarded IU benefits with a retroactive effective date of on or about December 23, 2010." [*Id.* at ¶ 11.] "Harrell's IU benefit application signed on January 10, 2011, obligated him to 'immediately inform the VA if he returned to work.'" [*Id.* (cleaned up).] "On or about February 6, 2019," Harrell "received" a letter from the VA notifying him that he had "a duty to notify the VA immediately if there is a change in any condition affecting [his] right to continued IU benefits." [*Id.* at ¶ 9 (cleaned up).] "The trial evidence and testimony overwhelmingly proved that he" received this letter. [R. 57: Sentencing Memorandum at 226.] "Tyler Rothstein explained that, if the letter had been returned as undeliverable to the VA, there would have been a record of such, but that no such record existed. Thus, the absence of proof of the letter's

undeliverability shows that the letter was in fact delivered." [*Id.* at 226-27; *see* R. 83: Tyler Rothstein, TR (Trial Day 1) at 1297-98 (said testimony).] "Further, the letter was addressed to the same Shelbyville address as all of Harrell's other VA correspondence during the relevant period and as was listed on the bank account where he received his VA benefits, and he does not claim that he did not receive any of the other correspondence." [R. 57: Sentencing Memorandum at 227.] In any event, "whether [he] received the . . . letter is . . . not critical." [*Id.* (explaining why).]

"On or about January 28, 2019, Harrell founded [VC], a nonprofit that provides services to and is dedicated to helping veterans through connection, healing, recovery, housing assistance, and vocational training." [R. 76: Presentence Report at ¶ 12.] "Since late January 2019, Harrell served as [CEO] and founder of VC in a volunteer capacity (*i.e.*, without receiving a salary or monetary compensation for his work)." [*Id.*] VC was an active and successful nonprofit, regularly managing assets in the $400,000 range, with an engaged multi-member Board, with at least one paid employee, and with thousands of volunteers and other regular members. [*See, e.g.*, R. 84: David Willis, TR (Trial Day 2) at 1499; R. 85: Ronnie Knuckles, TR (Trial Day 3) at 1737; R. 85: Chris Johnson, TR (Trial Day 3) at 1723.]

3

"Since the founding of VC, Harrell was personally and actively involved in operating VC, at times working in excess of 40 hours per week." [R. 76: Presentence Report at ¶ 13.] "The work activity Harrell . . . engaged in as CEO and [F]ounder of VC included, for example, being featured on news stories; giving media interviews; attending and speaking at community events; meeting with political, community, and business leaders; presenting to veterans' organizations; receiving awards; teaching classes; accepting donations; and being a guest on podcasts." [*Id.*] "Harrell was likewise involved in the day-to-day operation of VC and its various pursuits, engaging in other similar conduct as the tasks of running and operating VC necessitated." [*Id.*] "Since late 2019, Harrell's conduct as CEO and [F]ounder of VC was work activity demonstrating that Harrell could maintain substantial gainful employment, rendering him ineligible to receive the IU benefits he received during this time period." [*Id.* at ¶ 14.] Simply put, VC "was [Harrell's] baby. He was very passionate about being present and representing his organization." [R. 84: Brandon Elder, TR (Trial Day 2) at 1573.]

"Despite being informed in January 2011 of his duty to immediately notify the VA of his return to work, as well as notified in February 2019 of his duty to inform the VA of any change in condition affecting his right to IU benefits, Harrell never reported his true work activity on behalf of VC to the VA." [R. 76:

4

Presentence Report at ¶ 15.]  He then turned to affirmative lies to continue on the government dole.  "On or about September 14, 2022, during a VA Compensation and Pension (C&P) Evaluation, Harrell made false statements about his true work activity on behalf of VC."  [*Id.* at ¶ 16.]  "For example, Harrell stated that he merely did 'some things' with VC."  [*Id.*]  "When asked how frequently he participated in veterans' activities, Harrell responded, 'It is not a regular thing, just occasionally.'"  [*Id.*]  "When asked how many times he volunteered in the past thirty days, Harrell reported that he volunteered once."  [*Id.*]  "At the time Harrell made these misrepresentations in the C&P Evaluation, he knew he had engaged in multiple VC-related activities in at least the preceding thirty days."  [*Id.*]

After hearing evidence of Harrell's deception and lies to steal government benefits, a grand jury indicted him on one count under 18 U.S.C. § 641.  [R. 1: Indictment at 9-15.]  He went to trial; the jury convicted.  [R. 49:  Verdict Form at 203.]  The district court sentenced him to six months in prison, followed by one year of supervision.  [R. 68:  Judgment at 1030-32.]  This appeal followed.  [R. 71: Notice of Appeal at 1044.]

## SUMMARY OF THE ARGUMENT

I.    The evidence sufficiently supported Harrell's conviction for theft of government funds under 18 U.S.C. § 641.  Specifically, the evidence sufficiently

supported Harrell's knowledge and intent.  At least seven categories of evidence reasonably proved Harrell's knowledge and intent; he addresses none of these. Harrell's counter-arguments are not persuasive.

II.     The loss amount of $207,249.26 was correctly calculated.  The district court properly included (1) IU benefits paid to Harrell prior to September 14, 2022 (the date of Dr. Marsano's C&P Evaluation), (2) IU benefits paid to him after October 19, 2023 (the date of the Indictment), and (3) Dependents' Educational Assistance (DEA) benefits paid to his wife and daughter.

Alternatively, any error in including the IU benefits paid to Harrell after the date of the Indictment as loss was harmless.  The amount of additional benefits was approximately $20,160.37.  Subtracting that contested amount from the loss amount leaves a figure that still qualifies for the over-$150,000 U.S.S.G. § 2B1.1(b)(1)(F) enhancement that applied, so any error would not affect Harrell's offense level or guideline range.

III.    Harrell was required, and failed, to file a separate notice of appeal from the district court's amended judgment ordering restitution and subsequent forfeiture order.  Thus, this Court lacks jurisdiction to review Harrell's challenges to those orders.  Regardless, Harrell's challenges lack any merit.  Restitution was properly calculated.  The VA's losses were $207,249.26.

Moreover, litigation on the amount of forfeiture is ongoing such that there is not a final judgment to review.  In any event, Harrell waived or invited any alleged procedural error, and there was none, in the district court's handling of forfeiture in this case.  Harrell asked the district court at sentencing to defer the forfeiture determination.  The requirements in Federal Rule of Criminal Procedure 32.2(b) are not jurisdictional and allow for flexible handling of forfeiture issues, including deferral of a forfeiture determination post-sentencing.  Harrell's notice of appeal also did not deprive the district court of jurisdiction to impose forfeiture because forfeiture was not an aspect of the case involved in the appeal—since there was no final, appealable order when Harrell filed his appeal and Harrell has not appealed the post-sentencing forfeiture orders—and because Federal Rule of Appellate Procedure 4(b)(5) provides that the district court retains jurisdiction to correct a sentencing pursuant to Federal Rule of Criminal Procedure 35(a) after the filing of a notice of appeal.

## ARGUMENT

### I.    The evidence sufficiently supported Harrell's conviction.

Federal law criminalizes anyone "embezzl[ing], steal[ing], purloin[ing], or knowingly convert[ing] to his use or the use of another, . . . any . . . money[] or thing of value of the United States or of any department or agency thereof" in an

7

amount exceeding $1,000.  18 U.S.C. § 641.  "To support a conviction of theft of government property in violation of 18 U.S.C. § 641, the government must establish that the defendant (1) knowingly (2) stole or converted to [his use or] the use of another (3) something of value of the United States."  *United States v. Hall*, 549 F.3d 1033, 1038 (6th Cir. 2008).

At the close of the government's evidence, Harrell sought acquittal.  [R. 87: Casey McCall, TR (Trial Day 5) at 2155-57.]  Harrell renewed the motion at the close of all evidence.  [R. 87:  Casey McCall, TR (Trial Day 5) at 2207.]  The district court denied the motion.  [R. 54:  Order at 211.][1]

Faced with a sufficiency of the evidence challenge, the Court "asks only whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Maya*, 966 F.3d 493, 498 (6th Cir. 2020).  "This limited review bars courts from intruding on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Id.* at 499 (alteration omitted).  The Court "make[s] all reasonable inferences and credibility choices in support of the

---

[1] The district court denied the motion "for the reasons stated on the record." [R. 54:  Order at 211.]  There were plenteous reasons stated on the record for the motion's denial.  [R. 87:  James Chapman, TR (Trial Day 5) at 2157-60.]

jury's verdict." *United States v. Johnson*, 440 F.3d 832, 839 (6th Cir. 2006).
A defendant, thus, "faces a very heavy burden in attempting to overturn the denial
of a Rule 29 motion." *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014).

Harrell challenges § 641's mens rea element.  Harrell's Brief at 27-28.
"That is a particularly daunting task, given [the Court's] repeated guidance that
determinations about criminal intent should not be lightly overturned." *United
States v. Vance*, Nos. 23-5766/5773, 2024 WL 4867049, at *11 (6th Cir. Nov. 22,
2024).  "[I]t can be difficult to obtain direct evidence of something so internal as
[knowledge and] intent to commit fraud, so . . . juries may consider circumstantial
evidence and draw reasonable inferences from such evidence." *United States v.
Washington*, 715 F.3d 975, 980 (6th Cir. 2013).  Accordingly, "the question of
[knowledge and] intent is generally considered to be one of fact to be resolved by
the trier of the facts[,] and the determination thereof should not be lightly
overturned." *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003).

The jury could have reasonably concluded that Harrell had the requisite
knowledge and intent for guilt under § 641; indeed, overwhelming evidence
supported his guilt.  The prosecutor summarized, over approximately fourteen
pages, at least seven discrete categories of evidence supporting "how you know

that Mr. Harrell acted wrongfully or intentionally," none of which Harrell addresses on appeal.  [R. 87:  James Chapman, TR (Trial Day 5) at 2223-37.]

First, the IRS Form 990s.  A Form 990 is a type of tax return applicable to a nonprofit like VC; it is "a pretty lengthy 20-page form" that goes "in-depth in the finances of the non-profit" that VC filed because of its level of income.  [R. 85: Chris Johnson, TR (Trial Day 3) at 1705.]  The jury saw multiple 990s signed by Harrell under penalty of perjury "saying that he worked 60 hours a week for" VC. [R. 87:  James Chapman, TR (Trial Day 5) at 2224; *see*; R. 57:  Sentencing Memorandum at 267 (Gov't Trial Ex. 3A (2019 990)), 340 (Gov't Trial Ex. 3B (2020 990)), 439 (Gov't Trial Ex. 3D (2021 990)), 367 (Gov't Trial Ex. 3C (2022 990)).]  Harrell's assertions that he was working 60 hours a week for VC was inconsistent "with everything he said when he applied for government benefits." [R. 87:  James Chapman, TR (Trial Day 5) at 2224.]  To name just one example, "Harrell stated in the C&P exam that he engages in volunteer work about once a month, and most recently, about 45 days prior to the C&P exam"—not that he was "volunteering" 60 hours a week for VC.  [R. 87:  Sofia Marsano-Josefowicz, TR (Trial Day 5) at 2108.]  "This pattern of extensive misrepresentations well supports an inference of an intent to defraud."  *Vance*, 2024 WL 4867049, at 11 (citing *United States v. Robinson*, 99 F.4th 344, 357-58 (6th Cir. 2024)).

10

Second, an email between Harrell and VC's CPA.  The jury saw an email exchange from August 22, 2023, between Harrell and Chris Johnson, VC's CPA. [R. 57:  Sentencing Memorandum at 458-59 (Gov't Trial Ex. 3E).]  Johnson had sent Harrell a draft of the 2022 990.  [*Id.* at 466-96.]  Harrell asked if "we need to put me on that list on the last page at 60 hours[.]"  [*Id.* at 459.]  Johnson queried "[h]ow many hours d[id] you put into the organization[.]"  [*Id.*]  Harrell responded, "About 30 these days."  [*Id.* at 458.]

"[T]his email exchange is really so telling of Mr. Harrell's attitude and his tenuous, at best, relationship with the truth."  [R. 87:  James Chapman, TR (Trial Day 5) at 2224.]  Harrell's concern—at this point, after the C&P Evaluation had occurred and he was aware his benefits were being looked into—"wasn't whether that [60 hour per week] number was accurate or not."  [*Id.*]  "His concern was whether they *had to* put it."  [*Id.* (emphasis added).]  This could reasonably suggest to the jury that Harrell was attempting to fraudulently manipulate VC's IRS filings to inaccurately suggest he was working fewer hours than he actually was, in an attempt to later provide support that he was validly receiving IU benefits.

Further, there was "so much telling about [Harrell's] four simple words" in his response, "About 30 these days."  [*Id*. at 2225.]  At the outset, the jury reasonably could have concluded that the 30 hours per week figure was a lie.  Trial

11

testimony established that, during this period, Harrell was working 40-60 hours per week for VC.  [R. 85:  Ronnie Knuckles, TR (Trial Day 3) at 1746.]  "Further, [VC's] own website" reasonably suggested to the jury "that that figure is a lie.  Agent Schilling described [how] the 990 . . . for 2022[] that's on the [VC] website lists Mr. Harrell at 60 hours a week, even though the version that Mr. Johnson actually filed with the IRS changed it to 30.  But the version that [VC] wants to be out to the world says 60.  So [VC's] own website shows you that this isn't true."  [R. 87:  James Chapman, TR (Trial Day 5) at 2225; *see* R. 86:  Colloquy, TR (Trial Day 4) at 1823-25 (said testimony).]

Additionally, assuming that the 30 hours per week figure was true, the jury could have reasonably drawn the inference that Harrell was implicitly admitting that his previous 60 hours per week statements were accurate.  [*See* R. 87:  James Chapman, TR (Trial Day 5) at 2225-26.]  If Harrell was telling the truth that he worked 30 hours per week *these days*, the jury could have reasonably inferred that he was not challenging the truth of his assertions from years prior that he was working 60 hours per week during those years.

Further, again assuming that the 30 hours per week figure was true, the jury could have reasonably concluded that this shows that Harrell "lied to Dr. Marsano in that C&P evaluation when he told her he only did things occasionally, and in the

past 30 days he only volunteered once." [*Id*. at 2226.] All of these considerations reasonably support the jury's decision to convict. *See, e.g.*, *Robinson*, 99 F.4th at 357-58.

Third, Harrell's lies to the SSA. The jury read Harrell's lies to the SSA, available to the VA as part of its benefit decision-making process. [*See* R. 83: Tyler Rothstein, TR (Trial Day 1) at 1255-58; R. 57: Sentencing Memorandum at 539-75 (Gov't Trial Exs. 4K, 4L).] For example, Harrell told the government that he "can't focus, remember things, or even manage to get out of bed most days." [*Id*. at 550 (Gov't Trial Ex. 4K).] He answered the prompt to "[d]escribe what you do from the time you wake up until going to bed" by saying things like, "I just want to stay home and away from people" and "I spend time in basement by myself eat dinner go to bed," and without mentioning that he was the active and successful CEO and Founder of an organization who worked there 40-60 hours per week. [*Id.*] He said he is "often" not "motivated to get dressed" and lacks a desire to bathe. [*Id.* at 551.] He said he only goes outside "if I have to." [*Id.* at 553.] He said he only goes to the "VA for therapy & psychiatry" on a regular basis, although he was the active CEO of an organization. [*Id.* at 554.] These misrepresentations are irreconcilable with the reality that Harrell was the active and successful Founder and CEO of VC, putting in 40-60 hours per week. Similar false

13

statements pervade Exhibit 4L, and these are merely examples of the lies that saturate those documents.  [*See* R. 87:  James Chapman, TR (Trial Day 5) at 2226-30 (cataloguing Harrell's lies).]  As above, such a "pattern of extensive misrepresentations well supports an inference of an intent to defraud."  *Vance*, 2024 WL 4867049, at 11 (citing *Robinson*, 99 F.4th at 357-58).

Fourth, Harrell's lies to his own expert witness.  At trial, Harrell called Robert Piper as an expert.  [R. 86:  Nick Mudd, TR (Trial Day 4) at 1965.]  Although he was Harrell's expert, he was "not that familiar with the VA" and did not "even know the criteria for the [IU] benefits that we're here to talk about." [R. 86:  Colloquy, TR (Trial Day 4) at 1976, 1994.]  Harrell told him that his wife was a co-Founder of VC.  [*Id.* at 1980-81.]  Harrell said that she "had quite a bit to do with the day-to-day operations" of VC.  [*Id.* at 1981.]  Harrell concealed from Piper that he was the CEO of VC.  [*Id.*]  Harrell told him he was "only involved off and on" with the organization.  [*Id.* at 1982.]  Harrell told him that the extent of his involvement was "to have informal talks about his experiences in the Army"—not that he was the active and successful CEO who managed and operated essentially every part of the organization.  [*Id.* at 1982-84.]  Harrell told Piper that he puts in "20 to 30 hours on and off a week" and that there are "10 to 20 days every month when he is not able to do it at all."  [*Id.* at 1984-85.]  Harrell also concealed from

Piper that he has collegiate education.  [*Id.* at 1986.]  Harrell told him that his wife

"manages" VC.  [*Id.* at 1991.]  Continuing the trend, such a "pattern of extensive

misrepresentations well supports an inference of an intent to defraud."  *Vance*,

2024 WL 4867049, at 11 (citing *Robinson*, 99 F.4th at 357-58).

Fifth, Harrell's lies to the VA.  Perhaps most damning, Harrell made

numerous false statements directly to the VA, through Dr. Marsano, during his

September 2022 C&P Evaluation.  For example, he told Dr. Marsano that he lived

"a highly restricted life," not that he was an active and successful CEO.  [R. 57:

Sentencing Memorandum at 510 (Gov't Trial Ex. 4I).]  "When asked how

frequently he participates in activities with veterans['] organization he said 'it is

not a regular thing just occasionally.'"  [*Id.*]  When asked about his volunteer

work, he said he "occasionally" volunteered, not that he did so 40-60 hours per

week.  [*Id.*]  When asked what type of volunteer work he does, he said that he had

helped clean horse stalls at a farm, not that he was the Founder and CEO of

a successful nonprofit.  [*Id.*]  "When asked how many times he volunteered over

the past thirty days, Mr. Harrell reported that he volunteered once, and it was back

at the beginning of August."  [*Id.* at 510-11.]  When Dr. Marsano asked about his

reason for not working, Harrell responded, "I just don't have the ability to

perform."  [*Id.* at 512.]  Trial exposed the falsity of these assertions.  [*See, e.g.*,

R. 86:  Remington Schilling, TR (Trial Day 4) at 1804-947; R. 87:  Sofia Marsano-Josefowicz, TR (Trial Day 5) at 2050-154.]  When presented with such evidence herself, Dr. Marsano wrote an eight-page addendum documenting "the inconsistencies between the new evidence provided to me . . . and [Harrell]'s self-report during the 14 September 2022 C&P exam."  [R. 57:  Sentencing Memorandum at 531 (Gov't Trial Ex. 4J).]  Such a "pattern of extensive misrepresentations well supports an inference of an intent to defraud."  *Vance*, 2024 WL 4867049, at 11 (citing *Robinson*, 99 F.4th at 357-58).

As to this and Harrell's other falsehoods and efforts at deception, these factors show that "he knew he needed to hide" his true level of work activity at VC "because why else do you lie[?]"  [R. 87:  James Chapman, TR (Trial Day 5) at 2239.]  "If he didn't think that he wasn't doing anything wrong, then why not just tell the truth?"  [*Id.*]  "If he legitimately thought he could do what he was doing with [VC] and still g[e]t these IU benefits, Mr. Harrell would have no reason to lie about it."  [*Id.*]  The jury reasonably could have evaluated the evidence in this manner and concluded that Harrell's extensive levels of deception reasonably supported the requisite knowledge and intent.

Sixth, Harrell's behavior surrounding the C&P Evaluation.  Harrell engaged

in guilt-indicative behavior around the C&P Evaluation in September 2022.  As the

prosecutor described:

> You all will remember Agent Schilling's testimony about
> that—the day of Dr. Marsano's C&P evaluation, they were
> conducting surveillance.  Mr. and Ms. Harrell arrive at the VA in one
> car.  Unlike the previous time when Mr. Harrell drove himself, they
> go in together, they come out, get back in the car, drive away, and
> Agent Schilling follows them.  And what do they do?  They go to
> some abandoned parking lot about a mile—I think he said about
> a mile and a half, maybe two and a half miles away from the VA.
> They park in that parking lot, and lo and behold, Mr. Harrell's truck is
> already there.  Mr. Harrell gets back in his truck, and then they go
> their separate ways.
>
> They had come to this parking lot before the evaluation, driven
> there together, came back, and then split up.
>
> Agent Schilling follows Mr. Harrell, now driving his truck, and
> what does Mr. Harrell do?  Agent Schilling's right behind him.  Mr.
> Harrell runs that red light and gets away.  And then when they pass
> each other on the road, he looks right in his direction.
>
> So Agent Schilling got burned that in that surveillance.  Mr.
> Harrell was on the look-out, and you saw how shady that behavior
> was about going to this offsite parking lot where he had left his car
> and splitting up.
>
> Ladies and gentlemen, is that what you do if you're being
> forthright and honest?  It is not.

[R. 87:  James Chapman, TR (Trial Day 5) at 2235-36; *see* R. 86:  Colloquy, TR

(Trial Day 4) at 1833-41 (said testimony).]

The jury reasonably could have viewed Harrell's suspicious behavior—parking his truck in an offsite lot, riding with his wife to the VA for the C&P Evaluation, riding back to his vehicle, splitting up and going separate ways, being in the guilt-indicative mindset to be watching for surveillance, and running a red light to flee a surveilling agent—as evidence that he intended to take and knew that he was wrongfully taking VA money by putting on a false show of dependence, instead of simply driving to the VA himself.

Seventh, witness observations and Harrell's statements.  Numerous witnesses described "Mr. Harrell's deliberate efforts to avoid having his benefits messed with."  [R. 87:  James Chapman, TR (Trial Day 5) at 2236.]  "Mr. Harrell deliberately did not accept money from Mighty Oaks," a faith-based organization where Harrell was a team leader.  [*Id.*; *see* R. 84:  David Willis, TR (Trial Day 2) at 1479-81 ("[Harrell] said that . . . Mighty Oaks paid $1,000 for the week for the team leaders to go out there, but he couldn't accept money because it would interfere with his VA benefits.").]  Harrell said on "numerous occasions" that he was "working 60 to 80 hours a week" and that he "need[ed] more help."  [R. 84:  David Willis, TR (Trial Day 2) at 1476.]  On "numerous occasions," Harrell said "that he needed to hire an assistant."  [*Id.* at 1478.]  Harrell told David Willis, "I can work if I wanted to.  I just choose not to."  [R. 84:  David Willis, TR (Trial

Day 2) at 1487.]  Harrell said, "I'm 100 percent from the VA, so I choose not to work."  [*Id.*]  Harrell said he "just" "didn't want to" "work a normal a day job." [*Id.*]  Harrell also "deliberately did not accept [a] paycheck from [VC]."  [R. 87: James Chapman, TR (Trial Day 5) at 2236.]  Harrell told Julie Willis, around the time that a $400,000 donation was coming to VC to pay "the people who would be helping with the organization," that he "wouldn't be taking any of those funds" because "[i]t would take away from his disability income."  [R. 84:  Julie Willis, TR (Trial Day 2) at 1515-16.]  The jury reasonably could have interpreted these varied observations and Harrell's statements to witnesses that he was knowingly, intentionally, and wrongfully stealing from the VA.

Harrell attempts an undeveloped argument that he did not "knowingly and intentionally deprive[] the United States of the use or benefit of th[e] money." Harrell's Brief at 27.  He does not further explain what he means, but the proof reasonably supported that he did knowingly and intentionally deprive the United States of the use or benefit of the money.  The money was "government benefits paid to him that he then used in his life.  Anyone receiving government benefits is depriving the United States of the use of that money."  [R. 87:  James Chapman, TR (Trial Day 5) at 2222.]  "That's the entire point of government benefits."  [*Id.* at 2223.]  "[O]nce a [v]eteran receives that monthly check for IU benefits," there

19

are not "any conditions on what the [v]eteran is then allowed to do with that money." [R. 83: Colloquy, TR (Trial Day 1) at 1268.] IU benefits are "not a loan." [R. 83: Tyler Rothstein, TR (Trial Day 1) at 1268.] "It's [the veteran's] money that they can spend however [they] want." [*Id.*] Indeed, Harrell continues to deprive the United States of the use of the money to this day; he has twice defied district court orders to repay a lump sum of liquid assets, and he continues to contest his monetary penalties in this appeal. [R. 110: Response at 2483-91 (narrating events).]

Harrell also claims that he "was not receiving any income"[2] and rhetorically asks, "If a veteran can still receive IU benefit payments when the veteran has a household of four people, and earns a salary at approximately $36,000.00[,] then why is Harrell convicted of theft of public funds when he does not bring in any income?" Harrell's Brief at 28. The most basic answer (ignoring numerous nuances that a comprehensive rebuttal would require) is that eligibility for IU benefits "comes down to" whether a veteran is "unable to work," not whether the veteran is receiving money for his work. [R. 83: Colloquy, TR (Trial Day 1) at 1260-62.] The veteran must be able to be employed above the poverty threshold,

---

[2] While Harrell did not receive a VC salary, he had a VC credit card "that he would use on things like gas in his truck and to go out to eat." [R. 87: James Chapman, TR (Trial Day 5) at 2213; *see* R. 85: Travis Rahill, TR (Trial Day 3) at 1697-98.]

as Harrell's hypothetical seemingly targets.  [*See, e.g.*, *id.* at 1262.]  Harrell would have been paid well above the poverty threshold—up to $250,000 per year—in his role as CEO.  [R. 86:  Christine Miller, TR (Trial Day 4) at 1799-801; R. 85:  Chris Johnson, TR (Trial Day 3) at 1725 ($75,000 per year).]  "[T]he large amount of [VC] assets disclosed on th[e] 990 forms," "consistently over $400,000," shows "more than enough to cover the salary of a CEO."  [R. 87:  James Chapman, TR (Trial Day 5) at 2212.]  Harrell's subordinates were paid $75,000 and $100,000 per year.  [R. 85:  Travis Rahill, TR (Trial Day 3) at 1683; R. 85:  Ronnie Knuckles, TR (Trial Day 3) at 1743.]

To explore just one nuance the hypothetical does not address, if a veteran is capable of work exceeding the poverty threshold, but chooses to earn a salary under the threshold (perhaps in an attempt to earn IU benefits and supplement his income on the side), the veteran would not be eligible for IU benefits.  This makes sense.  If the rules were different and a veteran "could work for his family business and just choose not to take a salary" because he knew he would get the benefit of the business through his family, that veteran, in essence, "would have the federal taxpayer subsidizing his employment with his family business paying his salary through his IU."  [R. 87:  James Chapman, TR (Trial Day 5) at 2213-14.]  That is, in effect, this situation:  "Harrell was employed as the CEO of this organization,

21

deliberately chose not to take a salary, and ha[d] the federal taxpayer subsidize that salary in place of the organization." [*Id.*]  That makes this case "even more aggravated than . . . a typical theft of government funds case." [*Id.* at 2239.] Harrell used his non-acceptance of a salary as a talking point, to paint a picture of false righteousness to the world, as he put "himself out into the world as a champion of [v]eterans," all while he was lying to the government to continue to receive IU benefits and, therefore, "stealing from the very [v]eterans that he purport[ed] to be helping," as the federal taxpayer was subsidizing his work as CEO.  [*Id.*; *see, e.g.*, R. 85:  Ronnie Knuckles, TR (Trial Day 3) at 1746-47.]

Additionally, Harrell continues to try to erase his work on behalf of VC by arguing that "[o]ne trial witness testified" that he had "a" panic attack and that he was "unable to do the day-to-day operations at" VC.  Harrell's Brief at 28-29. Thomas Rierdon implausibly told the jury that Harrell "was not capable of being the CEO" despite the fact that Harrell "has in fact been the CEO." [R. 87: Colloquy, TR (Trial Day 5) at 2174.]  Rierdon incredibly testified that a different person, Corey Bowlin, "actually runs [VC]." [*Id.* at 2174-75.]  But he had no reason to doubt the "several witnesses and overwhelming evidence that that is not true." [*Id.* at 2715.]  A host of witnesses disagreed with Rierdon's outlier take. [*See, e.g.*, R. 84:  David Willis, TR (Trial Day 2) at 1487-88; R. 84:  Julie Willis,

TR (Trial Day 2) at 1517-18; R. 84: John Sisco, TR (Trial Day 2) at 1540; R. 85: Brandon Elder, TR (Trial Day 3) at 1592; R. 85: Tammy Yarbrough, TR (Trial Day 3) at 1620; R. 85: Kristin Gallagher, TR (Trial Day 3) at 1634; R. 85: John Miles, TR (Trial Day 3) at 1648; R. 85: Lori Paris, TR (Trial Day 3) at 1659-60; R. 85: Travis Rahill, TR (Trial Day 3) at 1699; R. 85: Ronnie Knuckles, TR (Trial Day 3) at 1747; R. 86: Christine Miller, TR (Trial Day 4) at 1797-98.] Bowlin himself disagreed, stating that Harrell was "extremely active" and "extremely successful" as Founder and CEO of VC. [R. 87: Colloquy, TR (Trial Day 5) at 2191.]

It was well within the jury's province not to believe Rierdon's implausible testimony, particularly when Rierdon himself admitted he had no reason to doubt the overwhelming evidence that his testimony was not true, when a raft of witnesses disagreed, and when Bowlin—who Rierdon claimed ran VC—himself disagreed and said that Harrell was extremely active and successful as CEO and Founder. *See, e.g.*, *United States v. Jefferson*, 149 F.3d 444, 445 (6th Cir. 1998) ("We defer to the jury's resolution of witness credibility and, where there is conflicting testimony, to its selection between competing inferences."). The "evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Wallace*, 51 F.4th 177, 183 (6th Cir. 2022). While Harrell may

have had "plausible arguments to make at trial, they were clearly rejected by the jury when it found [him] guilty." *United States v. Rosales*, 990 F.3d 989, 994 (6th Cir. 2021).

Finally, Harrell—again, the CEO of an organization—argues that he was not capable of "substantially gainful employment" under the VA's definition. Harrell's Brief at 29. "Substantially gainful employment is defined as employment at which non-disabled individuals earn their livelihood with earnings comparable to the particular occupation in the community where the [v]eteran resides." [R. 83: Tyler Rothstein, TR (Trial Day 1) at 1267.] Harrell claims, without citing evidence, "there are not any other livelihoods in his community that [are] comparable to [his] volunteer work as CEO." Harrell's Brief at 29. That ignores the plain language of the definition. The definition (at least in this context) examines the capacity for over-poverty-level employment with *earnings* comparable to Harrell's occupation in his community.[3] There was testimony to the earnings that Harrell would have made, had he accepted a salary, to be CEO.

---

[3] In any event, the jury, using its "common sense" and "everyday experience with people and events," readily could have determined that the occupation of CEO is an easily comparable position of employment. [R. 47: Jury Instructions at 171.] Essentially every organization has a CEO or leader. If being CEO of an organization would not qualify as substantially gainful employment, it is difficult to imagine what would. Again, it does not matter that Harrell chose to be CEO without accepting a salary; what matters is whether he was *capable of* substantially gainful employment. [R. 83: Tyler Rothstein, TR (Trial Day 1) at 1266.]

[R. 86:  Christine Miller, TR (Trial Day 4) at 1799 ($100,000 to $250,000 per year); R. 85:  Chris Johnson, TR (Trial Day 3) at 1725 ($75,000 per year).]  His subordinates, again, were paid $75,000 and $100,000 per year.  [R. 85:  Travis Rahill, TR (Trial Day 3) at 1683; R. 85:  Ronnie Knuckles, TR (Trial Day 3) at 1743.]  If his subordinates earned their livelihoods on $75,000 and $100,000 per year, then Harrell, in the superior position of CEO, who would have earned between $75,000 and $250,000 per year, was able to maintain substantially gainful employment within the meaning of the definition.  The jury could have reasonably concluded as much based on the evidence presented.

## II.    The loss amount was properly calculated.  Alternatively, any error in including the IU benefits paid to Harrell after the date of the Indictment as loss was harmless.

A criminal sentence must be procedurally reasonable, which generally requires an accurately calculated guideline range.  *United States v. Snelling*, 768 F.3d 509, 515 (6th Cir. 2014).  Under U.S.S.G. § 2B1.1, the offense level increases based on the amount of loss.  U.S.S.G. § 2B1.1(b)(1).  As applicable, the offense level increases by ten if the loss is "[m]ore than $150,000."  § 2B1.1(b)(1)(F).  Loss means "the greater of actual loss or intended loss."  *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021).  Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense."  *Id.* at 482.  Pecuniary harm is

25

"harm that is monetary or that otherwise is readily measurable in money."
U.S.S.G. § 2B1.1(b)(1) *Notes to Table (C)(iii). Reasonably foreseeable
pecuniary harm is "pecuniary harm that the defendant knew or, under the
circumstances, reasonably should have known, was a potential result of the
offense." *Id.* *Notes to Table (C)(iv); *see United States v. Wendlandt*, 714 F.3d
388, 393-94 (6th Cir. 2013) (explaining loss-calculation principles). The district
court "need only make a reasonable estimate of the loss." *United States v. Iossifov*,
45 F.4th 899, 924 (6th Cir. 2022). Further, the "sentencing judge is in a unique
position to assess the evidence and estimate the loss and so the court's loss
determination is entitled to appropriate deference." *Id.* at 924-25 (cleaned up).
"The government must prove the loss amount attributable to a defendant by
a preponderance of the evidence." *Id.* at 925.

The district court calculated the loss amount to be $207,249.26. [R. 88:
Court, TR (Sentencing) at 2339-54; R. 76: Presentence Report at ¶ 23.] This total
included three sub-parts that Harrell contests: (1) IU benefits paid to him prior to
September 14, 2022 (the date of Dr. Marsano's C&P Evaluation), (2) IU benefits
paid to him after October 19, 2023 (the date of the Indictment), and
(3) Dependents' Educational Assistance benefits paid to his wife and daughter.

*See* Harrell's Brief at 31-32.  The Court reviews the loss calculation for clear error.
*Iossifov*, 45 F.4th at 926.

The calculation was correct.  First—the IU benefits paid to him prior to
September 14, 2022.  The Indictment addressed the period from February 6, 2019,
through the date of the Indictment, October 19, 2023.  [R. 1:  Indictment at 13
(¶ 15).]  Harrell claims that "the Government did not prove by a preponderance of
the evidence that relevant conduct began in 2019."  Harrell's Brief at 31.  That is
incorrect.  "Overwhelming evidence at trial proved that Harrell was capable of
substantial gainful employment throughout the time period of the Indictment, and
specifically through September 14, 2022."  [R. 57:  Sentencing Memorandum at
222; *see* R. 88:  Court, TR (Sentencing) at 2340-41 (ruling).]

"Start with the plenteous exhibits introduced against Harrell.  [VC]'s tax
records—signed by Harrell under penalty of perjury—indicate Harrell working 60
hours per week in 2019, 2020, 2021, and 2022."  [R. 57:  Sentencing Memorandum
at 223 (citing Gov't Trial Exs. 3A, 3B, 3C, and 3D).]  "His LinkedIn profile also
supported loss in the relevant time periods."  [*Id.* (citing Gov't Trial Ex. 5).]  "His
emails also support loss prior to September 14, 2022."  [*Id.* (citing Gov't Trial Exs.
10A, 10B, 11A, 12A, 13A, 14A, 15A, and 18A).]  "So do his social media posts,
which document his many [VC]-related activities throughout 2018 to 2022."  [*Id.*

27

(citing Gov't Trial Exs. 8A, 8B, and 8C).]  "For 2019 alone, the government

submitted approximately 56 Instagram posts into evidence.  These posts are

Harrell's own words promoting the work he was conducting on behalf of [VC] and

indicate Harrell's gainful employment capability."  [*Id.*]

"Move next to his media appearances. His news and podcast appearances

support loss during the at-issue time periods."  [*Id.* (citing Gov't Trial Exs. 20A,

20B, 20C, and 20D).]  "News and magazine articles by and about him do too."  [*Id.*

(citing Gov't Trial Ex. 6A, 6B, and 6C).]  "As one article, published on August 22,

2019, described, Harrell had led [VC] stretching back to 2017 and, for his [VC]

work, was named the Male Kentucky Veteran of the Year in 2018."  [*Id.* (citing

Gov't Trial Ex. 6C).]  "Harrell's news presence included stories about the multi-

million-dollar project for the Tiny Home Community in Louisville and receiving

the national Patriot Award, which is given to a nonprofit organization or individual

that demonstrates positive, measurable impact in veteran-service-related areas."

[*Id.*]

"Consider also the host of witnesses."  [*Id.* at 224.]  "At a minimum, David

Willis, Julie Willis, Kassi Cawood, John Sisco, and Brandon Elder supported the

overwhelming evidence that Harrell was capable of substantial gainful

employment in the 2019 period."  [*Id.*; *see* R. 84:  David Willis, TR (Trial Day 2)

at 1463-88; R. 84:  Julie Willis, TR (Trial Day 2) at 1503-18; R. 84:  John Sisco, TR (Trial Day 2) at 1527-40; R. 84:  Kassi Cawood, TR (Trial Day 2) at 1547-60; R. 84:  Brandon Elder, TR (Trial Day 2) at 1562-76; R. 85:  Brandon Elder, TR (Trial Day 3) at 1583-95.]  "Further, at a minimum, Tammy Yarbrough, Kristin Gallagher, John Miles, Lori Paris, Travis Rahill, Ronnie Knuckles, and Christine Miller did as well for the period before September 14, 2022."  [R. 57:  Sentencing Memorandum at 224; *see* R. 85:  Tammy Yarbrough, TR (Trial Day 3) at 1596-1620; R. 85:  Kristin Gallagher, TR (Trial Day 3) at 1627-34; R. 85:  John Miles, TR (Trial Day 3) at 1635-48; R. 85:  Lori Paris, TR (Trial Day 3) at 1650-60; R. 85:  Travis Rahill, TR (Trial Day 3) at 1661-99; R. 85:  Ronnie Knuckles, TR (Trial Day 3) at 1731-47; R. 86:  Christine Miller, TR (Trial Day 4) at 1757-98.]

In sum, as the district court held, "those facts certainly considered collectively suggest that Mr. Harrell was capable of full-time employment in 2019."  [R. 88:  Court, TR (Sentencing) at 2341.]  That Harrell has a different view of the evidence from before September 14, 2022, "does not move the ball."  *Vance*, 2024 WL 4867049, at *4 (citing *United States v. Guerrero*, 76 F.4th 519, 534 (6th Cir. 2023)).

Second—the IU benefits paid after October 19, 2023.  "Harrell continued to receive IU benefits after the Indictment due to his administrative appeal of the

29

decision to end his benefits." [R. 57: Sentencing Memorandum at 224; *see* R. 84: Tyler Rothstein, TR (Trial Day 2) at 1365-66 ("Because Mr. Harrell requested that hearing, what is the status of his IU payments up to the present day?" "So currently, he still gets this 100 percent every month currently." "All right. And one more time, why is that?" "Because we haven't taken the final action on this yet."); 1446 (describing process, where Harrell "has requested his hearing" and was "going through his due process of law"); R. 86: David Blanchard, TR (Trial Day 4) at 1955; R. 83: Nicholas Mudd, TR (Trial Day 1) at 1243 (admitting that "the government's still paying him"); R. 88: Nicholas Mudd, TR (Sentencing) at 2307 (stating that "he's still fighting that VA benefits appeal").] *See, e.g.*, 38 C.F.R. § 3.103(b)(2) ("[N]o award of compensation . . . shall be terminated, reduced or otherwise adversely affected unless the beneficiary has been notified of such adverse action and has been provided a period of 60 days in which to submit evidence for the purpose of showing that the adverse action should not be taken."); *id.* § 3.103(c); *id.* § 3.103(d)(1) ("Upon request, a claimant is entitled to a hearing on any issue involved in a claim within the purview of part 3 of this chapter before VA issues notice of a decision on an initial or supplemental claim."). Harrell "would not have received IU benefits after the Indictment but for his fraudulent maintenance of the benefits from 2019-2023." [R. 57: Sentencing Memorandum

at 224.]  "In other words, if he had been truthful with the VA and not committed this crime, he would not have received IU benefits after the Indictment."  [*Id.*]

Accordingly, the amount of IU benefits after the Indictment is properly considered "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1) *Notes to Table (C)(i).  The term "offense" incorporates relevant conduct.  U.S.S.G. § 1B1.1 cmt. n.1(I).  Relevant conduct, in turn, means all acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. § 1B1.3(a)(2).  "Harrell's post-Indictment receipt and acceptance of IU benefits, after affirmatively appealing the administrative decision to end his benefits to ensure he stayed on the government dole as long as possible, was part of the same course of conduct or common scheme or plan as the offense of conviction."  [R. 57:  Sentencing Memorandum at 225.]

As the Fourth Circuit explained in an "analogous" scenario:

> Tribble maintains that . . . the district court erred in computing the amount of loss his offenses had caused, because its calculation of loss included benefits he received after he was indicted.  He asserts that the correct measure of loss is the reasonably foreseeable pecuniary harm resulting from his offenses, and that it was not reasonably foreseeable that the Government would continue to pay benefits to him after he was indicted.  Tribble thus contends that the court's loss computation should properly have included only those benefits paid prior to his indictment.

31

> Tribble's contention on this point must also be rejected, because the sentencing court correctly applied the Guidelines in its handling of this issue. Under the Guidelines, the "actual loss" caused by an offense is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, comment. (n.3(A)(I)) (2004). In this situation, it was entirely reasonable for Tribble to foresee that he would continue to receive benefits until he was actually convicted. Like any accused, a defendant charged with workers' compensation fraud is innocent until proven guilty. Consistent therewith, the pertinent statute requires that compensation benefits be terminated when a beneficiary is convicted of a fraud scheme relating thereto. Tribble has failed to explain why the OWCP was required to deviate from that procedure here. Indeed, he does not contend that the OWCP (or any other government agency) gave him any basis for such an expectation. As a result, this final contention is also without merit.

*United States v. Tribble*, 209 F. App'x 332, 341-42 (4th Cir. 2006) (citation omitted). [R. 88: Court, TR (Sentencing) at 2345 (finding *Tribble* "analogous" and that "it supports the finding as it relates to the loss amount").] Other cases also support such a rule. *See, e.g.*, *United States v. Jones*, 716 F.3d 851, 860-61 (4th Cir. 2013) ("[I]t is entirely foreseeable that losses caused by a fraudulent scheme will not cease the moment that coconspirators confess to the fraud. . . . We therefore conclude that it was reasonably foreseeable that the Navy would not terminate BAH payments until it had finished its investigation and formally determined that the BAH funds had been illicitly obtained. While one can quibble over whether the Navy acted with utmost dispatch to stop the payments to Alexander and Bowers, we nonetheless believe that the amount estimated by the

32

district court was a foreseeable loss caused by the fraud."); *United States v. Fecondo*, No. 22-00011, 2023 WL 7646494, at *8 (E.D. Pa. Nov. 14, 2023) (citing cases) ("Although the Government charged Defendant's failure to pay over employee payroll taxes only during 2015 and 2016, it proved, by a preponderance of the evidence, that Defendant engaged in virtually identical conduct both prior to the investigative period and continuing after the Indictment.  Accordingly, I find that the 2017-2019 conduct properly counts as relevant conduct for purposes of determining the tax loss."); *cf. United States v. Rivera-Ortiz*, 14 F.4th 91, 104 (1st Cir. 2021) (approving including loss figures from "outside of the timeframe set forth in the indictment" based on definition of relevant conduct); U.S.S.G. § 2B1.1 cmt. n.3(E)(ii) (stating that in "a case involving government benefits," as here, "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients," *i.e.*, the full value of the IU benefits obtained by Harrell, an unintended recipient).

Harrell argues that he "should not be punished . . . because the VA continued to pay him despite [its] knowledge of the pending indictment and the documentation within [its] own network system."  Harrell's Brief at 32.  But the "VA didn't voluntarily continue paying Mr. Harrell.  [It] had issued a decision cutting off his benefits.  [It] only continued to pay Mr. Harrell after the date of the

indictment because he affirmatively appealed that decision administratively."
[R. 88:  James Chapman, TR (Sentencing) at 2344.]  Harrell "continued to receive
the benefits post-indictment because he was affirmatively pursuing them by
requesting an administrative hearing.  So he's . . . consciously continuing to argue
that he should receive those, and he could have foreseen that he was benefiting
from ultimately what became determined by the jury as fraud after he was
indicted."  [R. 88:  Court, TR (Sentencing) at 2345.]

Alternatively, any error in including the IU benefits paid to Harrell after the
date of the Indictment as loss was harmless because it would not affect the
guideline calculation.  *United States v. Castro*, 960 F.3d 857, 867 (6th Cir. 2020).
The amount of additional benefits was approximately $20,160.37.  [*Compare*
Gov't Trial Ex. 17B, *with* Gov't Trial Ex. 17A (exhibits submitted to clerk via disc
pursuant to 6 Cir. I.O.P. 10(d)); *see* R. 48:  Exhibit and Witness List at 202
(admitting exhibits).]  Subtracting that contested amount from the loss amount of
$207,249.26 leaves $187,088.89, a figure that still qualifies for the over-$150,000
§ 2B1.1(b)(1)(F) enhancement that applied at sentencing.  "Accordingly, even if
the district court erred . . ., that error would not have affected [Harrell]'s offense
level or Guideline range and was therefore harmless."  *Castro*, 960 F.3d at 867; *see*

*United States v. Johnson*, 79 F.4th 684, 706 (6th Cir. 2023) (same, in loss calculation context).

Third—the DEA benefits.  DEA benefits are education-assistance benefits paid by the VA to veterans' dependents.  [R. 88:  Remington Schilling, TR (Sentencing) at 2314.]  Harrell's wife and daughter received them.  [*Id.* at 2314-15.]  "In this context, DEA benefits are tied to IU benefits; Harrell's wife and daughter, in other words, would not have been entitled to and would not have received DEA benefits but for Harrell receiving IU benefits, which he did fraudulently during the relevant period."  [R. 57:  Sentencing Memorandum at 228; *see* R. 83:  Tyler Rothstein, TR (Trial Day 1) at 1295-96; R. 84:  Tyler Rothstein, TR (Trial Day 2) at 1364, 1388, 1392; R. 88:  Remington Schilling, TR (Sentencing) at 2315-16.]  Accordingly, because the VA wrongly expended money in DEA benefits as a result of Harrell fraudulently qualifying for IU benefits during the relevant period, the amount of DEA benefits included in the PSR was correctly considered loss because it was "reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1(b)(1) *Notes to Table (C)(i).

Harrell responds that he "did not make his daughter or wife apply for those benefits."  Harrell's Brief at 32.  But that does not address whether the wrongly-expended DEA benefits qualified as reasonably foreseeable pecuniary harm that

resulted from the offense.  "[T]he amounts of money that were expended in DEA

benefits to [Harrell's] wife and daughter" was all "monetary loss to the VA."

[R. 88:  Colloquy, TR (Sentencing) at 2316.]  "[T]here's no question that the VA

paid out these benefits for this time period, and there was no eligibility, right?  So

that's a loss."  [R. 88:  Court, TR (Sentencing) at 2352.]  That loss resulted from

Harrell's offense "[b]ecause Mr. Harrell had received the IU benefits under false

pretenses.  Because he was rated at the IU rating of the 100 percent, and that was

false information given to the government for that rating, those DEA benefits were

also given under false pretenses and tied to that IU specifically."  [R. 88:

Remington Schilling, TR (Sentencing) at 2316-17.]  If Harrell "had accurately

disclosed his work activity to the VA and he had not lied about his level of work

activity to the VA," "he would not have received [IU] benefits and, therefore, his

family members would not be entitled to the DEA benefits."  [*Id.* at 2317.]


### III.    Harrell was required, and failed, to file a separate notice of appeal from the district court's amended judgment and subsequent forfeiture order, precluding this Court's review of Harrell's challenges to the district court's amended judgment and forfeiture order.

"Federal Rule of Appellate Procedure 3(c)(1) provides that a notice of

appeal must . . . designate the judgment, order, or part thereof being appealed."

*United States v. Glover*, 242 F.3d 333, 334-35 (6th Cir. 2001) (quoting Fed. R.

36

App. P. 3(c)(1)(B)).  "By enacting this provision, Congress has limited this Court's appellate review to issues designated in the notice of appeal." *Burley v. Gagacki*, 834 F.3d 606, 620 (6th Cir. 2016) (quoting *Glover*, 242 F.3d at 335).

### A.    Restitution

Harrell appealed the initial judgment, "Doc. No. 68." [R. 71:  Notice of Appeal at 1044.]  This judgment did not impose an amount of restitution; it, instead, said that restitution was "[t]o be determined." [R. 68:  Judgment at 1035.] A little over a month later, the district court entered an amended judgment that set out the restitution amount of $207,249.26.  [R. 90:  Amended Judgment at 2426.] Harrell did not appeal the amended judgment.

"The requirement that a defendant file a timely notice of appeal from an amended judgment imposing restitution is at least a mandatory claim-processing rule." *Manrique v. United States*, 581 U.S. 116, 121 (2017).  Here, the government "timely raise[s] [Harrell]'s failure to file a notice of appeal from the amended judgment imposing restitution before the Court of Appeals." *Id.*  Accordingly, this Court's "duty to dismiss the appeal is mandatory." *Id.* at 122; *see id.* at 125 ("We hold that a defendant who wishes to appeal an order imposing restitution in a deferred restitution case must file a notice of appeal from that order.  Because petitioner failed to do so, and the Government objected, the Court of Appeals

37

properly declined to consider his challenge to the amount of restitution imposed.");
*see, e.g.*, *United States v. Gonzalez-Rivera*, 111 F.4th 150, 156 (1st Cir. 2024)
("Given the holding in *Manrique*, it is nose-on-the-face plain that we lack
jurisdiction to consider the appellant's challenge to the restitution award.").

Alternatively, restitution was properly imposed and calculated. For
"offense[s] against property" under Title 18, including offenses "committed by
fraud or deceit," the district court "shall order . . . that the defendant make
restitution to the victim of the offense[s]." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii).
"In each order of restitution, the court shall order restitution to each victim in the
full amount of each victim's losses as determined by the court and without
consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1).
The government bears the "burden of demonstrating the amount of the loss
sustained by a victim as a result of the offense" by a preponderance of the
evidence. *Id.* § 3664(e).

"[T]he amount of restitution ordered by the district court is reviewed for an
abuse of discretion." *United States v. Bogart*, 576 F.3d 565, 569 (6th Cir. 2009).
"[T]he findings of fact underlying the district court's loss calculations—both for
Guidelines enhancement and restitution purposes – will be overturned only if
clearly erroneous." *United States v. White*, 492 F.3d 380, 414 (6th Cir. 2007).

Clear error is "highly deferential," and reversal is warranted under that standard only when an appellate court is "left with the definite and firm conviction that a mistake has been committed." *United States v. Louchart*, 579 F. App'x 492, 495 (6th Cir. 2014) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574-75 (1985)).

Before sentencing, the government explained why restitution in an amount of $207,249.26 was proper. [R. 57: Sentencing Memorandum at 236-37.] At sentencing, "out of an abundance of caution," the district court "g[a]ve the defense some time to . . . file anything as it relates to restitution going forward." [R. 88: Court, TR (Sentencing) at 2398-99.] Although the district court "ordered Harrell to submit a filing indicating his position on the amount of restitution by December 26, 2024," he "did not do so." [R. 77: Response at 1083.] Accordingly, the district court ordered: "To the extent any outstanding objections would have been coterminous with Mr. Harrell's objections at sentencing, the Court has already overruled those objections. To the extent additional objections exist, the Court gave Mr. Harrell an opportunity to raise them, and he failed to do so. Thus, for the reasons stated on the record at sentencing, the Court agrees with the United States' and the Probation Office's recommendation as to the restitution amount." [R. 89: Order at 2419.]

Harrell now argues that his preferred loss figure "should apply to the restitution imposed as well." Harrell's Brief at 34. Setting aside that restitution is not necessarily the same as loss, [*see* R. 88: Court, TR (Sentencing) at 2399 (pointing this out),] this claim simply restates, as purportedly applicable to restitution, the arguments regarding loss. For the reasons stated in Section II, Harrell's arguments are wrong. *See United States v. Agrawal*, 97 F.4th 421, 442 (6th Cir. 2024) ("Because she tied [restitution and loss] together, her request for a reduced restitution award fails for all the same reasons that we have already given."). At the least, the district court did not commit clear error in making its findings of fact on this issue.

Relatedly, Harrell claims that the "district court did not rely on information with a sufficient indicia [sic] of reliability." Harrell's Brief at 34. Harrell does not specify what piece(s) of proof he thinks was/were insufficiently reliable; the argument is waived. *United States v. Fowler*, 819 F.3d 298, 309 (6th Cir. 2016) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a skeletal way, leaving the court to put flesh on its bones."). Regardless, if Harrell intended to merely restate his prior arguments regarding the evidence, they fail for the reasons previously stated. *See Agrawal*,

97 F.4th at 442.  The district court considered ample evidence, including proof

from Harrell's trial, and its reliance on that proof was not erroneous.  In any event,

"a simple disagreement as to how to interpret the facts presented to the district

court" does not require reversal.  *Vance*, 2024 WL 4867049, at *6.

### B.    Forfeiture

The judgment Harrell appealed did not include forfeiture.  [R. 68:  Judgment

at 1035-36 (leaving forfeiture unchecked).]  The district court entered an order

amending the judgment to reflect that a forfeiture determination was deferred at

sentencing and a separate, subsequent forfeiture order imposing a money judgment

in the amount of $108,454.88, but Harrell did not appeal either of these.  [R. 79:

Order at 1094; R. 93:  Order at 2433-35.]  *See* Fed. R. Crim. P. 32.2(b)(4)(C) ("If

the court later amends or declines to amend a forfeiture order to include additional

property under Rule 32.2(e), the defendant or the government may file an appeal

regarding that property under Federal Rule of Appellate Procedure 4(b).").

Moreover, as Harrell acknowledges, the forfeiture issue is not yet entirely settled

before the district court.  Harrell's Brief at 37. Harrell's failure to appeal these

orders, likewise, precludes this Court from reviewing this claim, requiring the

Court to dismiss it.  *Burley*, 834 F.3d at 620; *see, e.g.*, *United States v. Palacios*,

No. 22-11676, 2024 WL 4430281, at *6 (11th Cir. Oct. 7, 2024) ("Finally, we

can't review Palacios's challenges to the district court's amended forfeiture order
because Palacios did not appeal it."). And, because litigation on this issue is
ongoing, there is no "final decision" on forfeiture for Harrell to appeal or the Court
to review. 28 U.S.C. § 1291; *see also United States v. Martirossian*, 917 F.3d 883,
886 (6th Cir. 2019).

Harrell broadly argues that the district court "did not have jurisdiction to
amend [his] sentence," but he limits his arguments on this issue to the Court's post-
sentencing forfeiture order.[4]  Harrell's Brief at 34-40. Thus, even if the Court
considers Harrell's appeal of the forfeiture order properly taken, the district court
did not err in entering it. Harrell makes only a procedural challenge to the
imposition of forfeiture; he makes no substantive arguments regarding the
propriety or amount of the forfeiture money judgment imposed. However, Harrell
did not challenge the process employed by the district court in addressing
forfeiture and, instead, waived or invited any alleged error therein. Federal Rule of

---

[4] Harrell does not challenge the restitution order on this basis and, therefore,
has waived any argument to that effect. *See Tillman Transportation, LLC v. MI
Bus. Inc.*, 95 F.4th 1057, 1064 (6th Cir. 2024 ) ("[A]n appellant abandons all issues
not raised and argued in its initial brief on appeal"). Regardless, it is well
established that a district court can amend a judgment after the filing of a notice of
appeal to include restitution when the matter is deferred at sentencing. *See Dolan
v. United States*, 560 U.S. 605, 608 (2010); *United States v. Harrison*, 823 F.
App'x 430, 432-34 (7th Cir. 2020); *United States v. Tulsiram*, 815 F.3d 114, 117
n.2 (2d Cir. 2016); *United States v. McDougal*, 368 F. App'x 648, 651 (6th Cir.
2010).

Criminal Procedure 32.2 contains the procedural rules governing forfeiture in a criminal case. Rule 32.2's timing requirements are not jurisdictional and do not strip the district court of authority to enter a forfeiture order post-sentencing. *McIntosh v. United States*, 601 U.S. 330, 331 (2024) ("Rule 32.2(b)(2)(B) establishes a time-related directive.");[5] *United States v. Carman*, 933 F.3d 614, 617 (6th Cir. 2019) (finding that court's violations of Rule 32.2(b) did not deprive court of jurisdiction).

The government filed a motion for a preliminary order of forfeiture before sentencing, and Harrell did not oppose it within the time allotted by the local rules. [R. 55: Motion at 212-17.] *See* LCrR 47.1(d). However, at sentencing, Harrell "object[ed] to" forfeiture, thinking he could "wait and address it" then. [R. 88: Nicholas Mudd, TR (Sentencing) at 2402.] While the government objected to such a belated argument, Harrell reiterated that he "thought we were going to address it [at sentencing]" and asked to "file a supplement to the Court [after sentencing]." [R. 88: James Chapman, TR (Sentencing) at 2403; R. 88: Nicholas Mudd, TR (Sentencing) at 2403.] The court granted this request and "allow[ed] [Harrell] to

---

[5] This Court has held that Rule 32.2(b) is a mandatory claims-processing rule. *United States v. Maddux*, 37 F.4th 1170, 1180 (6th Cir. 2022). While that holding has been abrogated by the decision in *McIntosh* as it relates to Rule 32.2(b)(2)(B), that decision did not address Rule 32.2(b)(4)(B), and this Court has not considered the effect of *McIntosh* on its prior interpretation of that rule.

respond to [the motion]," opting to "deal with that subsequent to [the sentencing] hearing." [R. 88: Court, TR (Sentencing) at 2403.] Harrell then filed a response opposing the forfeiture money judgment sought by the United States. [R. 62: Response at 1019-20.] The district court ultimately rejected Harrell's arguments and imposed a forfeiture money judgment in the amount sought by the United States. [R. 93: Order at 2433-35.] At no point did Harrell assert that forfeiture must be decided at sentencing and his actions in requesting additional time to brief the issue resulted in the deferral of that determination.

"A defendant waives a known claim by 'agree[ing] in open court with a judge's proposed course of conduct." *United States v. Hall*, 373 F. App'x 588, 592 (6th Cir. 2010) (alteration in original) (citing *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002)). Similarly, a defendant invites an error when he "contribut[es] in some way to the district court's error without intentionally relinquishing a right." *United States v. Carter*, 89 F.4th 565, 568 (6th Cir. 2023). Harrell either intentionally relinquished or "contribut[ed]" to any alleged procedural error by asking the district court at sentencing for permission to "file a supplement to the Court" post-sentencing related to forfeiture. [R. 88: Nicholas Mudd, TR (Sentencing) at 2403.] A waived issue cannot be reviewed on appeal and an invited error should only be reviewed if "failing to do so would result in

44

manifest injustice." *Carter*, 89 F.4th at 568-70.  But there is no manifest injustice here as the government and Harrell cannot be considered "equally at fault" for the alleged error and Harrell has not claimed a violation of his constitutional rights. *See id.* at 570.  Instead, it would be unjust to allow Harrell to request to proceed in a certain manner and then, later, allow him to challenge his sentence by arguing that process was improper.

Still, the district court did not commit a procedural error in ordering forfeiture here.  "Forfeiture is mandatory for violations of 18 U.S.C. § 641." [R. 55:  Motion at 213 (citing authority).]  Harrell argues that the district court violated Rule 32.2 because "[t]he preliminary order of forfeiture was not entered prior to sentencing, and the district court did not include forfeiture when orally announcing the sentence."  Harrell's Brief at 38.  But Rule 32.2 expressly allows for "flexibility" and "exception[s]" to its timing directives.  *McIntosh*, 601 U.S. at 340.  Rule 32.2(b)(2)(B) requires the court to "enter the preliminary order [of forfeiture] sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant" but makes an exception if "doing so is impractical."  Fed. R. Crim. P. 32.2(b)(2)(B). Rule 32.2(b)(2)(C) also allows the court to enter a general forfeiture order that can be amended later, pursuant to Rule 32.2(e)(1), "[i]f, before sentencing, the court

45

cannot . . . calculate the total amount of the money judgment." Fed. R Crim. P. 32.2(b)(2)(C). While Rule 32.2(b)(4)(B) directs the court to provide notice of the forfeiture during the defendant's sentencing, it can comply with this requirement by "includ[ing] the forfeiture when orally announcing the sentence" or "otherwise ensur[ing] that the defendant knows of the forfeiture at sentencing." Fed. R Crim. P. 32.2(b)(4)(B). And that Rule further requires the court to "include the forfeiture order, directly or by reference, in the judgment," but states that its "failure to do so may be corrected at any time under Rule 36." *Id*.

The district court deemed it impractical to enter a preliminary order of forfeiture before sentencing as, despite the United States moving for entry of such an order, the court did not address the issue until sentencing. Harrell also found it impractical as he expected to merely address the issue at sentencing and requested additional time post-sentencing to brief the topic. Moreover, the district court ensured that the defendant knew of the forfeiture at sentencing and, ultimately, deferred making a specific determination, telling Harrell that, after he responded to the forfeiture motion, the court would "deal with that," as authorized by Rule 32.2(b)(2)(C). [R. 88: Court, TR (Sentencing) at 2403; *see* R. 79: Order at 1094 (recognizing "that a forfeiture determination was deferred at sentencing").] This Court has acknowledged that deferring a determination on the amount of

46

a forfeiture money judgment can comply with Rule 32.2(b)(4)(B).  *See United States v. Maddux*, 37 F.4th 1170, 1180 (6th Cir. 2022), *abrogated by McIntosh*, 601 U.S. 330.  Although the judgment did not initially include forfeiture, the court took steps to correct this error quickly, as authorized by Rule 32.2(b)(4)(B).[6]

Harrell also suggests that the filing of his notice of appeal divested the district court of jurisdiction to resolve the outstanding forfeiture question. Harrell's Brief at 38-39.  This argument ignores the district court's deferral of the forfeiture determination, as authorized by Rule 32.2(b)(2)(C), and misapplies the applicable law.  Generally, the "filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control *over those aspects of the case involved in the appeal*."  *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 626 (6th Cir. 2013) (emphasis added); *see United States v. Young*, 847 F.3d 328, 360 (6th Cir. 2017) (same).  "This transfer of power," accordingly, "does not effect a total divestiture of jurisdiction from the district court:  it retains jurisdiction . . . to adjudicate matters unrelated to the issues on appeal."  *Williamson*, 731 F.3d at 626; *see Island*

---

[6] To iterate, the forfeiture issue remains pending before the district court; while the court has ordered the imposition of a forfeiture money judgment in the amount of $108,454.388 and directed the forfeiture be included in the judgment, the second amended judgment has not yet been amended to reflect this and the United States has moved for such an amendment.  [R. 93:  Order at 2435; R. 107: Motion at 2472.]

*Creek Coal Sales Co. v. City of Gainesville*, 764 F.2d 437, 439 (6th Cir. 1985)

("Generally, notice of appeal deprives the district court of jurisdiction of all

matters forming the basis of the appeal.  This rule, however, is neither a creature of

statute nor is it absolute in character.").  Moreover, Federal Rule of Appellate

Procedure 4(b) states that "[t]he filing of a notice of appeal . . . does not divest

a district court of jurisdiction to correct a sentence under Federal Rule of Criminal

Procedure 35(a)."  Fed. R. App. P. 4(b)(5).

 For the reasons explained above, forfeiture could not have been, and was

not, an aspect of this case involved in the appeal as there was no appealable, final

decision on forfeiture when Harrell filed his appeal.  Further, Harrell did not appeal

the Order amending the judgment to refer to the deferral of forfeiture, which was

entered pursuant to Rule 35(a), or the Order of Forfeiture entered thereafter.  Thus,

the filing of Harrell's notice of appeal did not divest the district court of

jurisdiction to enter an order on the deferred issue of forfeiture.  To hold otherwise

would allow an appellant unilaterally to strip the district court of adjudicatory

authority over any topic he chose simply by briefing the topic on appeal, even if

the district court had not issued an appealable, final decision on that topic and even

if the appellant had not appealed that aspect of the case.  *See Cochran v. Birkel*,

651 F.2d 1219, 1222-23 (6th Cir. 1981) (allowing "the district court to proceed

where the order from which appeal is sought is itself clearly nonappealable"));
*United States v. Battles*, 745 F.3d 436, 448-49 (10th Cir. 2014) ("[T]he problem
for Ms. Battles is that the district court's ruling on the motion for a new trial was
never involved in—i.e., within the scope of—her notice of appeal."); *N.Y. State
Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1350 (2d Cir. 1989) ("[T]he filing
of a notice of appeal only divests the district court of jurisdiction respecting the
questions raised and decided in the order that is on appeal."); *cf. Harrison*, 823 F.
App'x at 432-34; *Tulsiram*, 815 F.3d at 117 n.2; *McDougal*, 368 F. App'x at 651-
52.

Harrell relies on this Court's decisions in *Carman* and *Maddux*, but the
circumstances of these cases are distinguishable and compel a different result.  In
*Carman*, the appellant-defendant appealed a forfeiture order entered more than
four months after she appealed her conviction and sentence, and in *Maddux* that
same appellant-defendant and her co-defendant appealed another forfeiture order
entered years later after the case was remanded back to the district court.  *Carman*,
933 F.3d at 616; *Maddux*, 37 F.4th at 1174.  Importantly, the district court had not
deferred making a forfeiture determination, pursuant to Rule 32.2(b)(2)(C) and, as
this Court held, had not otherwise ensured that the appellants "knew—in the same
way they would otherwise know had their money judgments been 'orally

announc[ed]' in their sentences—that they would still be subjected to money

judgments." *Maddux*, 37 F.4th at 1180 (alteration in original).  Moreover, the

United States had not timely moved to amend the judgment to include forfeiture,

pursuant to Rule 35(a), in those cases.

Thus, Harrell's case is distinguishable in almost every respect.  Here, the

government sought a preliminary judgment of forfeiture well in advance of

sentencing.  The time for Harrell to oppose the motion expired with no opposition.

The district court addressed forfeiture at sentencing, but Harrell sought deferral of

the forfeiture determination and additional time to brief the issue.  The district

court, attempting to be protective of Harrell's rights, granted his request and

deferred a determination on the amount of the forfeiture money judgment, pursuant

to Rule 32.2(b)(2)(C).  Then, promptly after entry of the original judgment, which

did not include forfeiture, the United States moved to amend the judgment to

include forfeiture, pursuant to Rules 35 and 36.  Harrell appealed his conviction

and sentence while that motion was pending and now uses the appeal's pendency

to argue that the district court lacks jurisdiction to address forfeiture, even though

he is the reason that forfeiture was not addressed originally and he has repeatedly

acknowledged the Court's deferral of this determination in his brief to this Court.

*See, e.g.*, Harrell's Brief at 38-40.  These circumstances make this case more like

*United States v. Ferrario-Pozzi*, where the court was unconvinced by the appellant's "contention that the court impermissibly deviated from Rule 32.2, especially as any divergence from formulaic compliance was occasioned by [the appellant's] own motion." 368 F.3d 5, 10 (1st Cir. 2004).

Harrell's requested relief would lay a roadmap for future defendants on how to manipulate the criminal process to avoid the imposition of forfeiture. The Court should not sanction such a manipulation, which would not only allow Harrell to escape a mandatory aspect of the punishment for his violation but also set the stage for further waste of judicial resources. *Cf. Terry*, 886 F.2d at 1349 (noting as basis for divestiture of jurisdiction upon filing of notice of appeal that "it is a waste of judicial resources for two courts to be considering the same issues in the same case at the same time").

## CONCLUSION

This Court should affirm Harrell's conviction and sentence.

Respectfully submitted,

PAUL C. MCCAFFREY
ACTING UNITED STATES ATTORNEY

CHARLES P. WISDOM JR.
CHIEF, APPELLATE DIVISION

By:    s/ James T. Chapman
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4804
James.Chapman2@usdoj.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7)(B).  According to a computer count, the principal

brief contains 12,373 words.

s/ James T. Chapman
Assistant United States Attorney


## CERTIFICATE OF SERVICE

On March 26, 2025, I electronically filed this brief through the ECF system,

which will send the notice of docket activity to:

Christy J. Love
*Attorney for Jeremy Wayne Harrell*

s/ James T. Chapman
Assistant United States Attorney

## APPELLEE'S DESIGNATION OF DISTRICT COURT DOCUMENTS

| Record Entry | Description of Document | Page ID# |
|:---:|:---|:---|
| 1 | Indictment | 9-15 |
| 47 | Jury Instructions | 167-99 |
| 48 | Exhibit and Witness List | 200-02 |
| 49 | Verdict Form | 203 |
| 54 | Order | 211 |
| 55 | Motion | 212-17 |
| 57 | Sentencing Memorandum | 222-925 |
| 62 | Response | 1019-21 |
| 68 | Judgment | 1030-36 |
| 71 | Notice of Appeal | 1044-45 |
| 76 | Presentence Report | — |
| 77 | Response | 1083-84 |
| 79 | Order | 1094 |
| 83 | Trial Day 1 Transcript | 1101-339 |
| 84 | Trial Day 2 Transcript | 1340-581 |
| 85 | Trial Day 3 Transcript | 1582-755 |
| 86 | Trial Day 4 Transcript | 1756-2037 |
| 87 | Trial Day 5 Transcript | 2038-293 |
| 88 | Sentencing Transcript | 2294-418 |
| 89 | Order | 2419-20 |
| 90 | Amended Judgment | 2421-28 |
| 93 | Order | 2433-35 |
| 107 | Motion | 2472-47 |